**SO ORDERED.**

**SIGNED this 02 day of June, 2009.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TODD GREESON, | ) | Case No. 09-11328 |
| VANESSA GREESON, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |
| | ) | |

**FINAL ORDER ON DEBTORS' MOTIONS TO USE CASH COLLATERAL
AND FOR TURNOVER OF VEHICLE**

NOW on this 27th day of May, 2009, this case comes before the Court for a final evidentiary hearing on the debtors' motion to use cash collateral (Dkt. 5) and motion for turnover of a vehicle (Dkt. 4) filed May 4, 2009. Debtors filed a supplemental motion to use cash collateral (Dkt. 13) on May 5, which was heard and considered with the initial motions. Debtors appear in person and by their attorney Elizabeth Carson. The United States of America (IRS) appears by U.S. Attorney, Emily Metzger. Western State Bank appears by its attorney Michael Munson.

Factual Background

-1-

Todd and Vanessa Greeson filed their chapter 13 petition on May 4, 2009. The Greesons operate Pay Dirt LLC, a dirt contracting business in Western Kansas. The Greesons did not file their schedules, statement of financial affairs, Form B22C, or chapter 13 plan with their petition. Those omitted filings are due May 19, 2009.

On the date of filing, debtors also filed motions to use Western State Bank's (Bank) and the United States' cash collateral (accounts receivable), and for the turnover of a 2005 Chevrolet truck that the Bank repossessed approximately one week prior to filing this case. The Bank objected to both motions and the Court convened an expedited preliminary hearing on May 6, 2009. After hearing the statements of counsel for the debtors, the Bank, and the United States, the Court entered an interim order allowing limited usage of $6,360 of cash collateral "to avoid immediate and irreparable harm to the estate" pursuant to Fed. R. Bankr. P. 4001(b)(1)(C). The Court continued the preliminary hearing to May 12, 2009 for an evidentiary hearing. At that hearing, the parties presented evidence and closing argument. The Court continued the interim cash collateral order in force and directed that a final hearing on cash collateral and turnover be deferred until May 27, 2009 to give the debtors time to file their schedules, statements of affairs, Form B22C, and a chapter 13 plan. Both the Court and parties are hampered in their approaches to this case by the lack of initial filings.

The evidence presented established the following.[1] Pay Dirt LLC was formed in 2005 by the filing of Articles of Organization on April 21, 2005. No operating agreement was prepared. At

---

[1] No further evidence was presented at the final hearing on May 27, 2009. The Court's findings are based on the evidence presented at the hearing on May 12, 2009. In addition, debtors' counsel orally announced at the final hearing that debtors were withdrawing their motion for turnover of the Chevy truck. The Court nonetheless includes its turnover analysis of the Chevy truck in this opinion as it pertains to the truck's status as property of the estate.

-2-

all times, Todd Greeson was the sole member of Pay Dirt. Greeson testified that Pay Dirt's jobs consisted primarily of excavation and dirt work in oil fields, landfills, and road and bridge construction jobs. Because Pay Dirt was a sole member LLC, no separate tax returns were prepared for Pay Dirt and the business income was shown on Schedule C to debtors' individual tax return. For tax year 2008, Pay Dirt reported a $21,000 loss.[2] The debtors testified that this loss was due to an alleged $225,000 receivable that they had not collected from a job in Oklahoma; Pay Dirt filed a lawsuit in Oklahoma state court in October of 2008 against the general contractor (Patriot Construction) and property owner (Patel) to collect.[3] That suit remains pending. Todd Greeson testified that if Pay Dirt wins that lawsuit, they will be paid because it was a bonded job.

After the Bank repossessed Pay Dirt's truck on April 24, 2009, Todd Greeson, acting on the advice of counsel, dissolved the limited liability company (LLC) by execution of a written consent for dissolution on April 28.[4] On May 3, debtors' counsel filed a notice of cancellation of the articles of organization with the Kansas Secretary of State, stating that "[t]he limited liability company has dissolved and has wound up its business."[5] Debtors then commenced this bankruptcy case, taking the position that with the dissolution of the LLC, the assets of Pay Dirt became their property, subject to the liens of the Bank and the IRS. At the May 6 hearing, the Court questioned the validity of that position. Shortly after the May 6 hearing, Todd Greeson executed documents of transfer, pursuant to which Pay Dirt conveyed its equipment (including a Caterpillar Excavator) and accounts

---

[2] Ex. 1.

[3] Ex. G and H.

[4] Ex. 2.

[5] Ex. F.

-3-

receivable to the debtors, subject to the liens of the Bank and the IRS.[6] By those transfer documents, debtors also assumed Pay Dirt's debts.

The debtors seek to continue to operate the business of Pay Dirt and to utilize its pre-petition accounts receivable which have a value of $28,600.[7] Pay Dirt's average monthly income for the period November, 2008 - April, 2009 was approximately $25,000. Pay Dirt is currently working one job from which it expects to earn $20,000 - $40,000 no earlier than 60 days out. Vanessa Greeson indicated that Pay Dirt had three other unspecified jobs in the pipeline but she did not know the amounts those jobs expected to bring in. The Chevy truck they ask to reclaim is titled in Pay Dirt, with the Bank's lien noted thereon.[8] Pay Dirt is the obligor on the promissory note in the principal amount of $230,920 evidencing the Bank's claim.[9] The Bank's claim is secured by a security interest in accounts, equipment, and vehicles.[10] Debtors each executed a personal guaranty of Pay Dirt's obligations to the Bank.[11] In addition to the Bank's claim, the receivables are subject

---

[6] Ex. 4 (Bill of Sale and Assignment dated May 8, 2009); Ex. 5 (Agreement dated May 8, 2009).

[7] That amount is derived from the sum remaining from two jobs that have been completed, billed, and collected ($8,600), one job that has been completed and recently billed, but not yet collected ($11,000) and one job that is near completion, but not yet billed or collected ($9,000).

[8] Ex. S.

[9] Ex. M. At the petition date, Pay Dirt owed the Bank $211,000.

[10] Ex. N and U. Debtors estimated the value of the Chevy Truck and excavator at $80,000 and a 1955 Chevrolet Bel Air classic car at $30,000-$50,000. A quarter section of real estate in Haskell County that was mortgaged to the Bank was transferred to Plains Construction in exchange for payment of a debt.

[11] Ex. W and X.

-4-

to four properly filed notices of federal tax lien filed on or about February 4, 2009.[12]

Analysis

Before determining whether the debtors may utilize any or all of this property, the court must first determine whether any of it is actually property of the debtors' estate. The Bank argues that none of this property belongs to the debtors because the purported dissolution and wind-up of Pay Dirt is incomplete and improper because it violates the Kansas statutory scheme of distribution priorities when winding-up an LLC.[13] The Bank also argues that the post-petition transfers from Pay Dirt to debtors are shams.

Based upon the testimony of the debtors and its review of the exhibits, the Court finds that the debtors intended to operate their business as an LLC and generally obeyed the entity form. They filed articles of organization consistent with KAN. STAT. ANN. § 17-7673(a) and (b) and made annual reports as required by statute.[14] While they did not enter into an operating agreement, the absence of same does not invalidate the validity or separate entity status of the company. KAN. STAT. ANN. § 17-7673(c) provides that an operating agreement is optional.[15] They did not file Form 1065 entity returns for the LLC, nor were they required to do so because single-member LLCs are treated as pass-through entities under the Internal Revenue Code. The bank account, promissory note and

---

[12] Govt Ex. 1-4.

[13] Under the Kansas Revised Limited Liability Company Act (KAN. STAT. ANN. § 17-7662 *et seq.* (2007), specifically KAN. STAT. ANN. § 17-76,119(a)(1), assets are to be first distributed to creditors in satisfaction of liabilities.

[14] *See* KAN. STAT. ANN. § 17-76,139; Ex. B-E.

[15] *See also* Webb Hecker, *The Revised Kansas Limited Liability Company Act of 2000*, 69 J. KAN. B. ASS'N. 16, 20 (2000).

-5-

security documents all list the LLC as the owner or obligor.[16] They prosecuted the collection action on one of their receivables in the name of Pay Dirt, LLC.[17] They hoped to benefit from limited personal liability. Thus, the Court significantly discounts Todd Greeson's statement that he only placed his business in an LLC form to procure a trade name.

Having found that Pay Dirt was legally organized, the Court must now determine what the legal status of the LLC's assets are in light of the debtors' attempt to dissolve it. KAN. STAT. ANN. § 17-76,118(a) provides that, upon dissolution, the manager or member of a Kansas LLC may wind up the company's affairs. Subsection (b) of that statute states that the person winding up the business has the power to convey company property and provide for the discharge of the company's liabilities. KAN. STAT. ANN. § 17-76,119(a) sets out a system of priorities for the distribution of company property. During wind-up, the company property is to be first distributed to creditors to satisfy company liabilities other than those liabilities that have been "reasonably provided for." Only if property remains after that distribution do the members share in it. KAN. STAT. ANN. § 17-76,119(b) states that a dissolved company "shall pay or make reasonable provision to pay" all claims and liabilities. These statutes make clear that LLC property should not be distributed to members while company liabilities remain unsatisfied.

Nevertheless, Todd Greeson has effectuated this transfer. The Court must therefore determine who now owns the company's property and whether it has become property of the estate. The Bank argues that under the trust fund doctrine, the assets of a dissolved entity represent a trust fund held by the shareholders for the benefit of the company's creditors and that creditors may

---

[16] Ex. K-Q.

[17] *See* Ex. G-H.

follow those assets into the hands of the shareholders, who hold the assets as trustees.[18] Under that theory, the debtors' legal interest in the LLC's property is not property of the estate and the creditors retain an equitable interest in it.[19] The Bank's position is undercut by the Tenth Circuit's opinion in *Amdura* where it held that the trust fund doctrine, as it relates to the scope of a bankruptcy estate, applies only where the entity's property has been distributed without affording the creditors an opportunity to present and enforce their claims against it.[20] The *Amdura* court concluded that because the assets were available to the creditors via the bankruptcy process, the creditors had an opportunity to present and enforce their claims and, in that event, the trust fund doctrine did not apply.[21]

The operation of two sections of the Bankruptcy Code makes the transferred property the property of the Greesons' bankruptcy estate. Section 541 provides that all legal and equitable

---

[18] *Carson v. Davidson*, 248 Kan. 543, 808 P.2d 1377 (1991) (holding that trust fund doctrine is viable in Kansas as regards corporations).

[19] *See* 11 U.S.C. § 541(d); *Begier v. Internal Revenue Service,* 496 U.S. 53, 59, 110 S. Ct. 2258, 110 L. Ed. 2d 46 (1990) (In preference action, debtor airline's prepetition payments to IRS of its trust fund tax obligations were not transfers of property of the debtor, but were transfers of property held in trust for the IRS; while debtor has legal title, it owns no equitable interest in the funds).

[20] *In re Amdura Corp.*, 75 F.3d 1447, 1452 (10th Cir. 1996); *see also United States v. Diviney*, 822 F.2d 960, 965 (10th Cir. 1987).

[21] The Court also notes that in *Carson,* the Kansas Supreme Court stated that a creditor of a dissolved corporation seeking to pursue corporate assets in the hands of stockholders, is statutorily required to obtain a judgment against the corporation and have execution on the judgment returned unsatisfied before it may maintain an action against the stockholders. 248 Kan. at 549-50. *See also*, KAN. STAT. ANN. § 17-7101(b) (2007), made a part of the general corporation code in Kansas. *But see Burge v. Frey*, 545 F. Supp. 1160, 1168 (D. Kan. 1982) (this prerequisite not required where the corporation is insolvent and it would be futile to first bring the action against the corporation); *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 792-95, 473 P.2d 33 (1970) (same exception applied in applying predecessor statute K.S.A. 17-4009).

interests of the debtors on the date of filing become property of the estate. Section 1306 expands the chapter 13 estate to include all property the debtors acquire post-petition. As the sole member of the dissolved LLC, Todd Greeson retained an interest in its property, albeit one that is encumbered by prior liens and subject to the claims of the creditors all of whom have priority over members.[22] While the Court does not doubt that the transfer of the company's property to Todd Greeson is in violation of the pertinent provisions of the LLC law, the bare fact of the transfer places the property within the estate. The Court is likewise convinced that any transfer of company property to Vanessa Greeson violated the LLC statutes because she was neither a creditor nor a member of Pay Dirt. That said, at least as regards the accounts and contracts receivable, Todd and Vanessa are now in possession of them and have at least a legal interest that falls within the broad ambit of § 541 and § 1306. Given that the Bank and the United States can both vindicate their rights against these assets in the bankruptcy process, the trust fund doctrine does not apply.

The situation is different concerning the Chevy truck because it is a titled vehicle.[23] A transfer of ownership of a vehicle must comply with Kansas' certificate of title statute, KAN. STAT. ANN. § 8-135(c). Even if Pay Dirt purportedly transferred the vehicle to the debtors pre-petition, no such transfer of record could have occurred because the vehicle is encumbered. KAN. STAT. ANN. § 8-135(c)(1) provides:

> An application for certificate of title shall be made by the owner or the owner's agent upon a form furnished by the division and shall state all liens or encumbrances

---

[22] *See* KAN. STAT. ANN. § 17-76,118(b) ("remaining assets" distributed to LLC members, after discharge of the LLC's liabilities) and § 17-76,119(a) (creditors enjoy first priority in distribution of LLC's assets).

[23] The Court heard no evidence concerning the 1955 Chevy other than its value and assumes that it, too, is titled in the LLC.

-8-

*thereon, and such other information as the division may require. Notwithstanding any other provision of this section, no certificate of title shall be issued for a vehicle having any unreleased lien or encumbrance thereon, unless the transfer of such vehicle has been consented to in writing by the holder of the lien or encumbrance. Such consent shall be in a form approved by the division.*[24]

Here, we are not dealing with a paper title.[25] The certificate of title statute, KAN. STAT. ANN. § 8-135(c), expressly provides that no paper title issues after January 1, 2003 *unless a vehicle is unencumbered.*[26] The provisions of § 8-135 for registering, transferring and titling encumbered vehicles with paper titles, however, apply to an electronic certificate of title.[27] Here, there is nothing in the record to show that Pay Dirt or debtors complied with § 8-135(c)(1) to assign or transfer the truck to debtors. The Court concludes that title to the truck could not have been transferred without the Bank's consent and that the Chevy truck remains the property of Pay Dirt.[28] It is not property of the Greesons' bankruptcy estate. Because of that, the Court cannot direct the Bank to turn over the Chevy truck to the debtors under § 542.

Having determined that the cash collateral is at least nominal property of the Greesons' estate, the Court must determine whether it may be used by them. Under § 363(e), the Court is required to condition such usage in a way that adequately protects the Bank's and the IRS' interest.

---

[24] Emphasis added.

[25] The title and registration receipt on the 2005 Chevy truck notes that it is covered by an "ETITLE." *See* Ex. S.

[26] *See* KAN. STAT. ANN. § 8-135d(a) (2008 Supp.) (Division of Vehicles retains possession of certificate of title electronically where vehicle is encumbered by lien).

[27] *Id.* ("The provisions of article 1 of chapter 8 of the Kansas Statutes Annotated, and amendments thereto, shall apply to an electronic certificate of title, except as otherwise provided . . ."). The Court's research of the Kansas Administrative Regulations revealed no regulations prescribing any method different from § 8-135(c) with respect to electronic certificate of titles.

[28] *See* KAN. STAT. ANN. § 8-135(c)(6) and § 8-1,157 (2008 Supp.)

-9-

The Bank's claim is approximately $214,000 on a promissory note signed by Todd Greeson on behalf of Pay Dirt. Todd and Vanessa Greeson each guaranteed repayment of the note. Repayment of the note is secured by an excavator and a pickup truck that the debtors value at $70,000, a restored 1955 Chevrolet Bel Air valued at between $30,000 and $50,000, a receivable that is currently in litigation in Oklahoma with a face value of $225,000, and current cash and receivables having a value of $28,600. The current cash consists of $8,600 in pre-petition collections. Debtors hope to collect another $20,000.[29]

In making this determination, the Court has not ignored the existence of the Patel receivable valued at $225,000. This account, which has stood unpaid since late 2007, is in suit in Oklahoma state court. Todd Greeson testified that the claim is against a "bonded job," but all that is in the record before the Court today is a copy of Pay Dirt's petition and amended petition. There is no evidence as to the status or progress of the litigation and this Court cannot, in good conscience, assign very much if any value to this receivable on the paltry record before it. The Court concludes that no value should be assessed to the Oklahoma receivable at this time, particularly given that it is over a year old and not even sued on until October of 2008. The extent of its recovery is therefore speculative at best.[30]

The Court concludes for the purpose of these motions that the Bank's claim of $214,000 is secured by between $128,000 and $148,000 in collateral value at best, leaving the Bank undersecured to the extent of $66,000 to $86,000. The Bank's position in the $28,600 cash and

---

[29] See note 7, *supra*.

[30] The Court received no evidence upon which to base a conclusion as to the suit's merits and makes no findings thereon.

receivables may be significantly further impaired if they were acquired more than 45 days after the filing of the notices of federal tax lien of February, 2009.[31] In that event, the IRS would take priority in the receivables. No evidence was presented on that point.

Mrs. Greeson testified that the debtors are confident of receiving more business and that they have between $20,000 and 40,000 worth of projects "in the pipeline." In 2008, Pay Dirt reported some $579,000 in gross income.[32] But, in 2009 year-to-date, the dirt business only produced about $130,000 in gross revenues.[33] While the debtors have cut their costs by eliminating, among other things, labor cost, they only project a gross margin of about $5,000 per month. The Court has already allowed them the use of $6,360.

Given the speculative nature of the Greesons' prospects in this business and the Bank's significantly under-secured position, the Court declines to permit the Greesons to use more than one-half of the pre-petition accounts receivable and therefore limits their cash collateral usage to $14,300 which includes the interim allowance of $6,360. The Court is reluctant to further impair the Bank's and the IRS' position by allowing all of the remaining cash collateral to be expended in the absence of any proven future work.

The debtors shall be permitted to use the $14,300, to the extent funds become available, on the following terms. Debtors may draw the initially approved $6,360 from the $8,600 that is on hand. Debtors may draw the balance of their $14,300 availability from the remaining $20,000 to

---

[31] *See* I.R.C., 26 U.S.C. § 6323(c); Barkley Clark, THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE, ¶ 5.07 (Rev ed. 2009) (discussing special priority given to certain Article 9 security interests coming into existence after the federal tax lien is filed and operation of the 45-day rule).

[32] Ex. 1, Schedule C.

[33] Ex. 7.

-11-

be collected by using one-half of the amount collected on any particular account receivable and retaining the other half of said collections in the cash collateral account for the benefit of the Bank and the IRS.

Repayment of any and all amounts expended by the debtors shall be secured by a first and prior security interest securing repayment to the Bank and the IRS, as their interests and respective priority may appears, of up to $14,300 plus interest at the rate of 6 per cent per annum, in all of debtors' assets, whether now owned or hereafter acquired, and including any LLC property interests they received post-petition as well as any accounts receivable generated post-petition. As a further condition of cash collateral usage, once debtors have obtained a balance of $14,300 in the cash collateral account, they shall retain that amount in reserve subject to the Court's further order. The debtors' motion to use cash collateral is therefore GRANTED IN PART, subject to the terms and conditions set forth herein.

The debtors' motion for turnover of the 2005 Chevy truck, having been withdrawn, is MOOT.

# # #